**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

REGINA ORSAIO,

                                      Plaintiff,                        6:17-cv-00685 (BKS/TWD)

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION;
ANTHONY ANNUCCI, Acting Commissioner of
DOCCS; RONALD HESS, Bureau Chief; and SUSAN
HROVAT, Senior Parole Officer,

                                      Defendants.

**Appearances:**

*For Plaintiff:*
Carlo A. C. de Oliveira
Cooper Erving & Savage LLP
39 North Pearl Street, Fourth Floor
Albany, NY 12207

*For Defendants:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
615 Erie Boulevard West, Suite 102
Syracuse, NY 13204

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Regina Orsaio brings this action against Defendants New York State Department

of Corrections and Community Supervision ("DOCCS"), DOCCS Acting Commissioner

Anthony J. Annucci in his official capacity, DOCCS Utica Area Office Bureau Chief Ronald

Hess in his official capacity, and DOCCS Utica Area Office Senior Parole Officer Susan Hrovat in her official capacity, alleging that she suffered employment discrimination, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 290-301. (*See* Dkt. No. 1, ¶¶ 62-106). Plaintiff seeks compensatory damages, punitive damages, and injunctive relief. (*Id.* ¶ 109). Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 30). For the reasons set forth below, the motion is granted in part and denied in part.

## II.    FACTS[1]

### A.    Plaintiff's Employment at DOCCS

Plaintiff joined DOCCS as a parole officer ("PO") in 2006. (Dkt. No. 30-1, ¶ 1). Plaintiff first worked at the Syracuse Area Office and later transferred to the Utica Area Office. (*Id.* ¶¶ 1–2; Dkt. No. 30-12, at 8–10). In 2008, Plaintiff. (Dkt. No. 30-1, ¶ 2). As a parole officer, Plaintiff supervised a caseload of parolees. (*See* Dkt. No. 30-1, ¶ 4). She and other parole officers in her unit were supervised by a senior parole officer ("SPO"); in turn, SPOs were overseen by a supervising parole officer—also referred to as a bureau chief or area supervisor. (*See id.* ¶¶ 5, 7). Plaintiff's direct supervisor between 2014 and December 2015 was SPO Randy Blais. (Dkt. No. 30-17, at 16). Subsequently, Plaintiff's supervisor was SPO Nick Pezdek and then Defendant Hrovat. (*Id.* at 17, 38).[2] From 2012 until he retired in September 2017, Defendant Hess was the bureau chief for the Utica Area Office Bureau. (Dkt. No. 30-1, ¶ 8; Dkt. No. 30-13, at 20–21)

---

[1] The facts have been drawn from Defendants' statement of material facts, (Dkt. No. 30-1), Plaintiff's response and counterstatement of material facts, (Dkt. Nos. 33, 33-1), and the attached exhibits, depositions, and declarations. The facts are taken in the light most favorable to Plaintiff.

[2] Hrovat was an SPO in the Utica Area Office from May to July 2016. (Dkt. No. 30-14, at 9–10, 98).

### B. Plaintiff's Sexual Orientation

Plaintiff identifies as a gay female and to her knowledge was the only gay employee in the Utica Area Office at all relevant times. (*See* Dkt. No. 30-12, at 28–29, 33). At her deposition, Plaintiff testified that a secretary named Francesca LaRosa knew about her sexual orientation as early as 2014, as Francesca knew Plaintiff "from outside, in the community." (*Id.* at 28–29).[3] According to this testimony, Hess learned Plaintiff was gay because the secretaries "would also talk" and were "friends" with Hess. (*Id.* at 29). Plaintiff recounted that LaRosa

> was very loud, for lack of a better word, and [would] say things with [Hess]. He would be in the lunchroom and she would yell something out or he would be next to her and she would say something. . . . [H]e would have to have been deaf not to hear it.

(*Id.*). As for other people with knowledge of her sexual orientation, Plaintiff recalled that her coworker Lana Jolma knew because "she talked to me about my girlfriend," (*id.*), and PO Jose Schwarz-Castillo had met Plaintiff's girlfriend at the entry door outside the parole office. (*Id.* at 37).[4] PO Karol Anderson, who worked at the Utica Area Office during the relevant period, submitted an affidavit stating that Plaintiff's sexual orientation "was mentioned a few times in conversations with co-workers" in "2014/2015" and "was common knowledge in the Utica Area Office." (Dkt. No. 33-5, ¶¶ 3, 4).

Plaintiff and Hess never spoke about her sexual orientation, (*id.* at 29–31), and she never heard him make derogatory comments about anyone's sexual orientation, (*id.* at 35). But in late 2014, Schwarz-Castillo and PO John Carswell told Plaintiff that Hess did not like her. (*Id.* at 35–36). Schwarz-Castillo told her it was "[b]ecause you don't like cock." (*Id.* at 36).

---

[3] LaRosa may also have met Plaintiff's girlfriend. (*See id.* at 37).

[4] Citing Blais's testimony, Plaintiff asserts that Blais knew her sexual orientation as early as July 2015, (Dkt. No. 33-1, ¶ 84), but that assertion is unsupported. Blais could not recall when he learned. (Dkt. No. 30-17, at 37–38). Further, though Plaintiff testified that "[p]eople at the office knew" she was gay, (Dkt. No. 30-12, at 28), she did not identify coworkers with knowledge of her sexual orientation other than the individuals referenced above.

According to Plaintiff's testimony, Hess learned about her sexual orientation at some point after September 2014 because "[t]hat's when I noticed his behavior towards me changing." (*Id.* at 28). While Plaintiff had had "[n]o problems with him" before then, Hess stopped talking to her after that date (*Id.* at 31).[5] Over time, "because of how Hess was acting," other officers "ostracized" her—they started "avoiding" her, and "if they would go on a custody situation, to look for someone, an absconder, or transport someone to the jail who was in custody, no one would ask [her] any longer and no one would include [her] any longer." (*Id.* at 87–88; *see also id.* at 83 (Plaintiff testifying that the other officers "were all afraid of" Hess, who kept her "isolated, segregated" and "wouldn't let [her] participate in anything")). Hess became "unapproachable" and gave Plaintiff "filthy looks"; if she "walk[ed] by," she could "hear him say, 'Douche bag.'" (*Id.* at 38). On one occasion, Plaintiff observed Hess mimicking her limp in front of two secretaries, causing them to laugh. (*Id.* at 118–19). This treatment made Plaintiff "very emotional," and she "sat at [her] desk crying half the time." (*Id.* at 210).[6]

In October 2015, Plaintiff discovered that a photograph of her posted on the office bulletin board had been defaced with a beard and mustache drawn over. (*Id.* at 89–91; *see* Dkt. No. 30-67, at 1). Some other photographs on the bulletin board showed alterations, including markings over the faces of male employees. (*See* Dkt. No. 30-67, at 2–3). Plaintiff did not know if Hess was aware of the defacement. (Dkt. No. 30-12, at 95). Hess testified that the first time he saw the defaced photograph of Plaintiff was when "the Office of Diversity Management called and asked" about it—i.e., after Plaintiff complained. (Dkt. No. 30-13, at 181–83).

---

[5] Hess, however, awarded Plaintiff a "Bureau Commendation" in November 2014 for her "exemplary actions demonstrated on Friday 10/31/14," when Plaintiff volunteered to ride along television crews "during Halloween night field activity." (*See* Dkt. No. 30-22).

[6] Plaintiff "[r]epeatedly" complained to Blais about Hess's treatment, but Blais could not recall when she first brought it up. (Dkt. No. 30-17, at 36–37).

Plaintiff does not conform to traditional gender stereotypes. (Dkt. No. 30-12, at 208). She "wear[s] men's clothing" and is "not ultra feminine." (*Id.*). Asked if anyone at the office ever made comments about her clothes, Plaintiff recalled a comment by PO John Martin at a time when she was "ostracized and isolated" and "Hess was putting the whole office against me." (*Id.* at 209). Although Plaintiff had never worn a tie to the office, Martin asked, "No tie today?" (*Id.*).

Defendant Hrovat testified she was not aware of Plaintiff's sexual orientation. (Dkt. No. 30-14, at 58). Although Plaintiff never discussed her sexual orientation with Hrovat, (Dkt. No. 30-12, at 30), Plaintiff denies Hrovat's lack of knowledge, asserting that her sexual orientation was common knowledge in the office and further noting that she does not fit traditional gender stereotypes, (Dkt. No. 33, ¶ 87). At her deposition, Plaintiff was asked about the basis for her belief that Hrovat discriminated against her based on sexual orientation. (Dkt. No. 30-12, at 128). She answered, "Because when she gave the time management example to me she used a transgender story to do it." (*Id.* at 129). Plaintiff was referring to a story that Hrovat relayed when counseling Plaintiff on time management. (Dkt. No. 30-14, at 71). Hrovat recounted that once she had interviewed a transgender parolee and "it was super interesting"; as a result, the interview took longer than expected. (*Id.*). Hrovat testified that, with this example, she "was simply trying to help [Plaintiff] understand that you can get some of [the interviews] done quickly and some you can't." (*Id.*). But Plaintiff thought this was an "inappropriate story." (Dkt. No. 30-12, at 211 ("I don't think professional supervisors giving a time management example should go into a transgender, I don't know if it's a he or she or she or he, to an employee.")).

### C.     Work-Related Issues in 2014–2015

#### 1.     Assignment to SIST

Plaintiff applied for and was assigned to the strict intensive supervision treatment ("SIST") caseload in 2011. (Dkt. No. 30-1, ¶ 154; Dkt. No. 30-12, at 45–46). There was only one

SIST officer in the Utica Area Office during Hess's tenure. (Dkt. No. 30-1, ¶ 164). SIST parolees are civilly confined and then released to the community. (*Id.* ¶ 155). The SIST caseload is lighter than the average caseload, with a goal ratio of 10 SIST parolees to one PO, compared to a desired ratio of 25 regular parolees to one PO.[7] (*Id.* ¶¶ 156, 158). SIST parolees require more work per parolee because the assigned PO must interact with the Attorney General's Office and the court on a more regular basis. (*Id.* ¶ 157).

To ensure a balanced distribution of the workload among POs, DOCCS uses a 1.00 goal scale. (*Id.* ¶ 160). Each type of case is assigned a certain weight—e.g., 1/10 for SIST cases and 1/25 for regular cases—so that a PO's workload is measured by the number of cases weighted according to case type. (Dkt. No. 30-16, at 46–48). As DOCCS Assistant Commissioner for Community Supervision Marco Ricci explained at his deposition:

> It's 25 to 1, 10 to 1, and it's broken down. So you take the weight and you say, what is the easiest way to do it? It has to equal 100 at the end of the day, or 1.0.
>
> If you have ten SIST cases, they are each valued at 10 to 1, times ten, is 100. That's 1.0. 25 to l; right? You will have 25 because they are each valued at .25, or whatever it is. So you would have 25 to 1 sex offenders because they are each valued at that. That's the math.

(*Id.* at 47). But DOCCS cannot control how many parolees are in a given county, how many parolees violate their parole in any given month, or how many finish their parole term in any given month. (Dkt. No. 30-1, ¶ 161). Given these factors, caseloads fluctuate. (Dkt. No. 30-1, ¶ 167; Dkt. No. 30-13, at 162–63). Accordingly, it is not unusual for a PO's workload to differ from the 1.0 goal; if there is a trend indicating high workloads, DOCCS will allocate additional staff, (Dkt. No. 30-1, ¶ 162; *see* Dkt. No. 30-16, at 50–51).

---

[7] According to Plaintiff, Hess could nevertheless "control the numbers" and increase a PO's caseload. (Dkt. No. 30-12, at 59). Hess testified that the goal ratios were set by his "bosses." (Dkt. No. 30-12, at 92).

## 2. Complaint About SIST Caseload

Plaintiff testified that Hess increased her SIST caseload once he learned of her sexual orientation. (Dkt. No. 30-12, at 47–49). She recounted:

> So I was right around average when I first did SIST. Then after he learned I was gay I had six SISTs and then, all of a sudden, I was having 15 regulars. So I was having 27 or 28 instead of the 20 figure. And that becomes extremely unmanageable at that point.

(*Id.* at 49). Based on the "par sheet that comes out monthly that shows caseload ratios," Plaintiff knew her "figures were higher" than those of male POs with non-SIST caseloads. (*Id.* at 49–50).

Although the parties did not submit staffing reports for late 2014 and early 2015, the record contains staffing reports showing individual caseload distributions as of July 2, 2015 and September 2, 2015. (Dkt. No. 30-65, at 2–3). In July, Plaintiff's caseload total was 1.37.[8] (Dkt. No. 30-65, at 2). Of the eight POs listed, only one other officer had a higher caseload than Plaintiff. (*Id.* (indicating that PO Peter DiMaggio had a 1.47 caseload total)). POs' caseloads ranged between 0.86 and 1.47. (*Id.*). In September, Plaintiff was no longer a SIST case officer, that role having taken over by PO Schwarz-Castillo. (Dkt. No. 33-3, ¶ 8). That month, Plaintiff's caseload total fell to 0.98; of the 17 POs listed, eight had higher caseloads; the numbers ranged from 0.49 to 1.80. (Dkt. No. 30-65, at 3). Ricci clarified that, while the total number of cases remained constant, the office had added one PO. (Dkt. No. 30-16, at 97–100). He also explained the difference in caseload distribution by noting that the office was 1.4 officers short in July but had 0.4 excess officer in September. (*Id.*).[9]

---

[8] Asked if this number was high, Ricci responded: "Not really. It's higher than what I would prefer, which is 1.0. Again, you can't look at one month because, like I explained earlier, the following month it could be .97. The month after that it could be 1.4. We don't control exactly. . . . It's very dynamic. It depends on who violates, who comes out." (Dkt. No. 30-16, at 94).

[9] Plaintiff points out that the new PO was "assigned a Utica City regular caseload" and therefore did not handle sex offender cases. Comparing her July 2015 caseload total of 1.37 to Schwarz-Castillo's September 2015 caseload total of 0.96, she reasons that the addition of a new PO who did not handle sex offender cases could not be the explanation for Schwarz-Castillo' lighter caseload. (*Id.*). Implicit in this reasoning is that SIST case officers were

Around the beginning of 2015, Plaintiff complained to Blais that her caseload was becoming overwhelming, (Dkt. No. 30-17, at 24–25; Dkt. No. 30-12, at 50), but he "didn't do anything" and "didn't say anything," (Dkt. No. 30-12, at 50–51). Blais testified: "There wasn't really much you could do. The numbers were the numbers at that point." (Dkt. No. 30-17, at 25). In March 2015, Plaintiff spoke to Blais about being removed from the SIST caseload, but Blais told her that Hess had denied the request. (Dkt. No. 30-12, at 51–52).

Plaintiff called Ricci asking to be removed from the SIST caseload. (*Id.* at 57). Ricci testified that he and Plaintiff had a "conversation around the fact that she felt burnt out, that she was tired of being the sex offender parole officer." (Dkt. No. 30-16, at 81–82). In his recollection, "she was looking to get off the caseload" and "said something like, 'I'm tired of hearing about sex offenders having sex.'" (*Id.* at 82). Plaintiff emailed Ricci on April 17, 2015, thanking him "for speaking with [her] on Monday and being understanding of [her] difficult decision to sign out of the specialized Sex Offender Unit." (Dkt. No. 30-23). She wrote:

> This decision is for no other reason then [sic] after close to 8 years in this unit I am becoming increasing concerned for my personnel [sic] medical well-being. Due to this reason I believe, as stated in my initial memo to Bureau Chief Hess, that my re-assignment back to a regular caseload would also be in the best interest of the agency as well.

(*Id.*). According to Plaintiff's testimony, by personal medical well-being, she "meant that the caseload was becoming unmanageable" and it was "affecting [her] emotionally, along with the harassment and discrimination and everything else that was going on." (Dkt. No. 30-12, at 55). But she knew that Ricci and Hess were the "closest of friends," so "rather than to come right out and say anything negative about Bureau Chief Hess [she] just sent that reason because [she]

---

only assigned SIST cases and non-SIST sex offender cases. It is unclear from the record, however, whether SIST case officers were also assigned cases that did not involve sex offenders.

wanted to be removed." (*Id.* at 55–56). Ricci emailed back that he would be posting her position so that other POs could bid on it. (*Id.*). But Plaintiff would be able to leave her spot only when another position opened up. (Dkt. No. 30-12, at 52–53; Dkt. No. 30-13, at 155).[10]

Plaintiff testified that Hess "played a game of post and re-post" for the next three months, so that Plaintiff only had one option left—to apply for "a caseload that had a disproportionate amount of Spanish-speaking parolees" even though she did not speak Spanish. (Dkt. No. 30-12, at 68–71). Eventually, Hess called her in and said, "You're going to have to take this caseload. It's the only one left. Be careful what you get." (*Id.* at 69). Plaintiff bid on and was awarded this "Utica city caseload" in July 2015. (*Id.* at 71–72; Dkt. No. 30-13, at 157).

### 3.    Caseload Assignments

When there is a vacant PO caseload in the Utica Area Office, it is posted through an email to all staff and a notice is affixed in two separate locations instructing staff to respond if interested in the position. (Dkt. No. 30-1, ¶ 38). The most senior applicant is awarded the position. (*Id.* ¶ 39). According to Rigby, a union representative, there is no "set time" from when the caseload is awarded to when the PO starts working on the caseload:

> There's nothing in writing that says you have to have a set time. There would be . . . many variables that delay it or make it even faster. A lot of it is staffing issues.
>
> . . . .
>
> You might be waiting for a backfill item, which means another parole officer to be transferred in before you are awarded out. It could be that caseload coverage has already been set up on that caseload, so they're awaiting to award that. But usually, generally speaking, if we have staffing, they're usually I've seen awarded within a month or so; when they're awarded, they start it.

---

[10] Although Ricci learned at some point that Plaintiff had "issues with the hostile work environment," it is not clear from his testimony whether this was a consideration raised when Plaintiff requested to be removed from the SIST caseload or when she asked to be transferred to Syracuse a year later. (*See* Dkt. No. 30-16, at 24–25, 87).

(Dkt. No. 30-18, at 40–41).

In September 2014, the Herkimer County caseload became vacant. (Dkt. No. 30-12, at 62). According to Plaintiff, she was the only PO who expressed an interest in this caseload at the time, which in her view explains why Hess did not post the position then. (*Id.* at 62–63). Although PO Lutz had told Plaintiff he was not interested in the position, Plaintiff learned from PO Carswell that Hess was trying to convince Lutz—an officer with greater seniority—to bid on it. (*Id.* at 62–64). Ultimately, Lutz bid on, was awarded, and filled the position in January 2015. (*Id.* at 63, 65). Asked about the basis for her belief that Hess delayed the posting because of antigay animus, Plaintiff responded: "He no longer was going to give me anything I wanted or was interested in because he no longer liked me because I was gay. Prior to that if I wanted to switch a duty day he was accommodating or did it the right way by policy." (*Id.* at 65).

Another position became vacant in August 2015 when PO Anderson—who covered the Otsego County caseload along with PO Paolozzi—was awarded a different bid. (*Id.* at 72; Dkt. No. 30-13, at 165–67). Hess testified that in the interim Anderson moved on to her new bid and Paolozzi covered for the entire Otsego County caseload. (Dkt. No. 30-13, at 169). He explained that made "the most operational sense" because Paolozzi's caseload total was 0.69 and Anderson's had been 0.46—combined, "barely one caseload." (*Id.* at 169–70; *see also* Dkt. No. 30-12, at 78).[11] Plaintiff applied for and was awarded the position. (Dkt. No. 30-13, at 167). Hess emailed to notify her and stated: "Please continue in your current assignment pending transition to your new caseload." (Dkt. No. 30-25, at 1). But Hess did not post the vacancy created by Plaintiff. (Dkt. No. 30-12, at 74). Plaintiff "kept asking" her supervisor, SPO Pezdek, "week

---

[11] Plaintiff testified that Paolozzi had to work overtime in order to cover the whole caseload; he had to manage his 27 cases plus 31 cases from the position vacated by Anderson. (Dkt. No. 30-12, at 75, 79–80; *see also* Dkt. No. 30-13, at 171).

after week," when she would transition. (Dkt. No. 30-12, at 73). He responded, "I don't know if you are. . . . Hess decided the numbers are low in Otsego County. He doesn't need two parole officers there any longer." (*Id.* at 73–74). Hess testified that historically the Otsego County caseload coverage had fluctuated between one and two officers, (Dkt. No. 30-13, at 105), and the volume of cases had "shrunk" by the time of the posting, (*id.* at 170). Plaintiff pointed out at her deposition that the change to one officer came "after ten years of two parole officers working in that county." (Dkt. No. 30-12, at 74).[12]

While Plaintiff was waiting to transition to the Otsego County caseload, the Herkimer County caseload became available again when PO Lutz vacated it around October 2015. (Dkt. No. 30-13, at 152, 171–73). Plaintiff bid on and was awarded the caseload. (*Id.*). She never assumed the caseload, however, because she applied for and was awarded a polygraph examiner position. (*Id.* at 171–72; *see infra* Part II.D.1).

### 4. Request for Overtime Opportunity

On August 21, 2015, Pezdek emailed staff about a one-time four-hour overtime opportunity. (Dkt. No. 30-24). He wrote: "Utica PD is attempting to set up a detail in Utica in which they will set up several road block check points inside the city. The detail is tentatively scheduled for 8/29 and run from 10pm-2am. We would like to get two to three officers to participate if possible." (*Id.*). Plaintiff and two other POs, who were senior to her, applied. (*See* Dkt. No. 33-3, ¶ 7). Plaintiff learned from Pezdek that Hess, after being informed of the candidates' identities, directed him to only take the top two officers who applied, effectively

---

[12] According to Hess, Paolozzi's coverage of the entire Otsego County caseload was not definitive or set in stone. (Dkt. No. 30-13, at 172 ("I don't recall having that conversation with her. I tell everyone, here's what we're doing. We don't have a full two caseloads so we're going to have this person cover and as soon as we get a body and I have regional approval, then we'll move you into the caseload."); *see also id.* at 175 ("Q. So it was your intention to leave the Otsego County caseload being managed by one parole officer alone; right? A. Not necessarily. It would be my intention if the numbers called for it.")).

excluding her from the overtime opportunity. (*See* Dkt. No. 30-12, at 82). Although Plaintiff did not complain, she testified that "[e]verybody was well aware" of her exclusion. (*Id.* at 84).

### 5. Request to Switch Duty Days

POs are assigned one "duty day" a week for their respective parolees to report in to them at the Utica Area Office or a rural report station.[13] (Dkt. No. 30-12, at 38; Dkt. No. 30-13, at 113). According to Plaintiff, POs may bid on a duty day that becomes available, and the spot is awarded to the most senior bidder. (Dkt. No. 30-12, at 39–40).[14] Around August 2015, Plaintiff learned that Pezdek was being promoted, and she told SPO Blais that she would like to switch from her Monday duty day to Pezdek's Tuesday duty day when it became available. (Dkt. No. 30-12, at 38–40, 44). She made the request to escape Schwarz-Castillo and Carswell's constant taunting. (*Id.* at 41–43). Blais told her he would ask Hess. (*Id.* at 40; Dkt. No. 30-17, at 30). Hess informed Blais that Plaintiff was "not getting it" because "the new policy was that whoever takes the caseload that's open works the duty day it's on." (Dkt. No. 30-12, at 41).[15] According to Hess, however, there was no policy, and the assignment of duty days was "done on a case-by-case basis with the operational needs of the office at the forefront"; the office would take into account, among other factors, the need "to accommodate the parolees in addition to the parole office and have them on the same duty day" so as "to cause the least disruption for the parolees . . . who have all made plans to report on a certain day." (Dkt. No. 30-13, at 121–22). Hess

---

[13] Different duty days do not differ in overtime opportunities or pay; they are a PO's regular requirement. (Dkt. No. 30-1, ¶ 106).

[14] Hess, however, testified that duty days are assigned based on the office's operational needs, not seniority. (Dkt. No. 30-13, at 114–15, 122). Similarly, Blais testified that there is "no such thing" as switching duty days and "no bidding." (Dkt. No. 30-17, at 31).

[15] Blais testified that Hess's explanation was that the office "really couldn't get in the habit of changing people's duty days" and that it "just create[d] too much of a disruption in the office operation." (Dkt. No. 30-17, at 31). Colleen Fey replaced Pezdek as a "backfill" and took the Tuesday day duty. (Dkt. No. 30-13, at 124).

testified that changing Plaintiff's duty day would have affected the 50 or so parolees reporting on her Monday duty day. (*Id.* at 123, 128).[16]

### D. Work-Related Issues in 2016–2017

#### 1. Polygraph Examiner Training

In September 2015, Plaintiff emailed Ricci expressing her interest in becoming a polygraph examiner (also known as polygrapher). (Dkt. No. 30-26). Later that year, Plaintiff saw a posting for a polygrapher assignment and decided to apply to "get away from the Utica area office." (Dkt. No. 30-12, at 95–96). Plaintiff was interviewed by Hess, SPO Leroy Walker, and Sex Offender Management Bureau Director Mary Adams/Kopp. (Dkt. No. 30-1, ¶ 135; Dkt. No. 30-13, at 191–92). In November 2015, Hess recommended Plaintiff for the position, which was ultimately offered to her. (Dkt. No. 30-13, at 191–92; *see also* Dkt. No. 30-29). She attended polygraph school in Maryland for 11 weeks from January to March 2016 and returned to the Utica Area Office on March 21, 2016. (Dkt. No. 30-13, at 131; Dkt. No. 33-2, at 16; Dkt. No. 30-12, at 100; Dkt. No. 30-30).

#### 2. Polygraph Duties and Nonpolygraph Duties

A polygraph examiner schedules and conducts exams with sex offenders and then prepares and submits reports of the exam results. (Dkt. No. 30-1, ¶ 137). According to Plaintiff, "new polygraphers were expected to average three exams per week depending on their schedule and other duties as determined by the area office." (Dkt. No. 33-3, ¶ 12). Hess's understanding was slightly different; Kopp told him that "they expected three polygraphs per week in addition

---

[16] Plaintiff disputes that inconvenience to parolees was what motivated Hess's refusal to switch her duty days. (Dkt. No. 33, ¶ 104). She notes that two male parole officers, Lutz and Radeljas, were allowed to select different duty days from the ones originally assigned to the POs they replaced. (*Id.* ¶ 103; Dkt. No. 30-12, at 44–45). As to Radeljas, who took over Plaintiff's caseload, Hess testified that he was assigned Thursday duty day because he was a brand-new recruit and his training officer was also working on Thursdays. (Dkt. No. 30-13, at 134–36).

to additional duties as determined by the area office."[17] (Dkt. No. 30-13, at 194). Hess decided that Plaintiff's additional duties would be the completion of Certificates of Relief Reports ("CRRs," also known as Certificates of Good Conduct) and Local Conditional Releases ("LCRs"). (Dkt. No. 30-13, at 194).[18]

A CRR is a report on an application made by an individual (not a parolee) to recover a privilege lost because of a criminal record. (Dkt. No. 30-1, ¶ 110; *see* Dkt. No. 30-14, at 21–22). To complete the report, a PO may be required to investigate and interview the applicant. (Dkt. No. 30-1, ¶ 111). The PO makes a recommendation whether relief should be granted, and the report is sent to Albany. (Dkt. No. 30-1, ¶ 112). An LCR, on the other hand, entails visiting inmates in jail, explaining the conditions for a local conditional release, and requiring a signature from inmates wishing to take advantage of an early release. (Dkt. No. 30-1, ¶ 139; Dkt. No. 30-14, at 27–28). Among other conditions, inmates have "to do a year on supervision regardless of when [they are] released"; according to Hess, "99 percent of the time," inmates are not interested because they would rather complete their sentence and "be done with it." (Dkt. No. 30-13, at 197–98; *accord* Dkt. No. 30-14, at 27–28).

While in polygraph school, Plaintiff learned from Schwarz-Castillo that Hess would assign all CRRs and LCRs when she returned. (Dkt. No. 30-12, at 101). Upon Plaintiff's return, Hess assigned her four CRRs—two on March 30, 2016, one on April 19, 2016, and one on May

---

[17] Plaintiff's own "Polygraph Interview Productivity Schedule" shows a goal of three per week. (Dkt. No. 30-51).

[18] In other offices, polygraphers' additional duties besides polygraph duties included assigning duty days, collecting parolee urine samples, and acting as building security guards at parole offices. (Dkt. No. 30-1, ¶ 151). According to Defendants' response to Plaintiff's interrogatories, additional duties included, but were not limited to, "duty roster rotation, metal detector duties, transports, delinquency work and custodies, covering reports for absent parole officers, etc." (Dkt. No. 33-2, at 91).

9, 2016—and five LCRs. (Dkt. No. 30-13, at 197–98, 217; Dkt. Nos. 30-35, -36).[19] Previously,

CRRs and LCRs had been rotated among POs within a regional office. (Dkt. No. 30-12, at 105,

115; Dkt. No. 30-13, at 204). Per Hess's testimony, he suggested to Kopp that the reports be

assigned to the polygrapher because of "how much time the polygraph person would have" and

because "they were traveling to these counties." (Dkt. No. 30-13, at 199–200). Kopp said "it was

a good idea." (*Id.* at 204).

### 3.      Performance of Polygraph Duties

In May 2016, Defendant Hrovat became Plaintiff's supervisor.[20] (Dkt. No. 30-52, at 1).

Hrovat was "responsible for time sheets, reports, just day-to-day things"; in addition, Walker

served as technical advisor, and he was "responsible for the actual polygraph input," evaluating

whether Plaintiff was "meeting her criteria, how her polygraph reports were, [and] if she was

doing those correctly." (Dkt. No. 30-14, at 39–40; *see* Dkt. No. 30-15, at 83). In the months after

the completion of polygraph school, Walker reviewed Plaintiff's polygraph exams and

determined that she was not performing her polygraph exams in accordance with her training.

(Dkt. No. 30-1, ¶ 232; *see* Dkt. No. 30-61, at 3–4, 11, 12; Dkt. No. 30-54; Dkt. No. 30-55).

Walker and Plaintiff discussed the mistakes she made in her exams. (Dkt. No. 30-1, ¶ 232; *see*

Dkt. Nos. 30-57, -58).

In July 2016, Plaintiff's polygraph school instructor, Billy Thompson, emailed Plaintiff

that her interviews were "very poor" and she was "not doing what was taught in school." (Dkt.

No. 30-53). Plaintiff replied that she was "not being allotted the time needed to conduct a proper

thorough polygraph exam" because the agency had put her on a "restricted schedule." (*Id.*).

---

[19] According to Hess, however, all five LCR cases involved inmates who either declined local conditional release or had been released. (*See* Dkt. No. 30-13, at 197; Dkt. No. 30-36).

[20] Hrovat was an SPO in the Utica Area Office from May 5 to July 8, 2016. (Dkt. No. 30-1, ¶ 3).

Walker, who was copied on the email, "immediately called her supervisor and [Hrovat] said that wasn't true"; Walker then looked at the exam tapes and saw "they were completed in 75 minutes, 80 minutes," (Dkt. No. 30-15, at 33–34), not the 90-minute minimum required by American Polygraph Association standards, (*see* Dkt. No. 30-61, at 11).[21] In response to Walker's criticism of the quality of her exams, Plaintiff explained that she was not given enough time to conduct polygraphs and she was "emotionally upset almost every day, crying, due to . . . [t]he treatment [she] was receiving." (Dkt. No. 30-12, at 149–50). She felt "lost from the get-go due to the harassment and the discrimination and everything else they were doing." (*Id.* at 201). In August, Walker emailed Plaintiff and confronted her about her claim that the improper method she was using had been taught in school. (Dkt. No. 30-55). Walker noted that he had spoken to Thompson and "was informed that the information you provided me was inaccurate." (*Id.*).

With respect to output, Plaintiff's "Polygraph Interview Productivity Schedule" shows that, in each of the 12 weeks following her start as a polygrapher, Plaintiff had at most two polygraph exam interviews scheduled. (Dkt. No. 30-51). In a June 15, 2016 email to Ricci, copied to Hrovat, Hess commented that, based on his review of the 12-week schedule, Plaintiff had "failed to meet [Sex Offender Management Unit ('SOMU')] expectations every week & (3) of the weeks she conducted no polygraph exams." (Dkt. No. 30-40). In an email to Adams/Kopp (copied to Ricci, Hrovat, and another DOCCS employee), Hess reported that Plaintiff had only completed 12 polygraph exams in 12 weeks or "(1) per week on average." (Dkt. No. 30-39). He

---

[21] Although Plaintiff told Walker that she felt rushed because Hrovat warned she would not be paid overtime for administering polygraph exams, Walker testified that "nobody was getting overtime" for polygraphs within the unit. (Dkt. No. 30-15, at 34–35). He added: "I mean, if you're doing three polygraphs a week, that's not overtime. Overtime has to be reasonable and it has to be something that's needed. You can't just make overtime. So none of the examiners were getting overtime for polygraphs. They were only doing three a week." (*Id.* at 35). Walker could recall only one time "we did have overtime in the unit." (*Id.* at 36). "[W]e were down to four examiners and I was covering Buffalo, Rochester, Elmira, Binghamton. We was [sic] all over the place. . . . I was doing 25 to 30 exams a month." (*Id.* at 36–37).

noted that, starting on May 31, 2016, "we stopped assigning any additional duties to allow her to focus on the polygraph duties exclusively"; despite this accommodation, Plaintiff had "conducted only (2) polygraph exams over the past (2) weeks since that date." (*Id.*). Walker confirmed to the group that Plaintiff should be completing three polygraph exams per week. (*Id.* at 2).[22]

On September 23, 2016, Plaintiff wrote about her performance issues in reply to an email that Walker had sent her the day before and on which Thompson and DOCCS officers were copied. She stated:

> I realize you have been consistently unhappy with my work as a Polygraph Examiner. On numerous occasions I have informed you that I was working under extreme harassing conditions at the Utica Office. I would not wish another individual to suffer the way I did. Unfortunately, these conditions impacted my work; make note, I was a new recruit trying my best to acquire a new skill.
>
> I have since requested to be removed from this specialized assignment and moved back to a regular [PO] position with the supervision of a caseload. I strongly believe after all that has occurred within the last 6 months that I am best suited for that position. I have not yet moved and I am hopeful that I will be able to move in the very near future. Until then, I will continue to perform all the job requirements and duties of the Polygraph Examiner position to the best of my ability, that is all I can do.

(Dkt. No. 30-57, at 2). Adams/Kopp forwarded the email to Timothy O'Brien, who expressed concern about the fact that Plaintiff had copied an outside vendor (Thompson) and that she was alleging harassment. (*Id.* at 1). Later that day, Adams/Kopp provided an update on the situation. (*Id.*). She informed O'Brien and others that Walker was "making arrangements to go to Syracuse

---

[22] According to a chart summarizing the number of exams completed by examiners advised by Walker in 2016, Plaintiff completed 72 exams. (Dkt. No. 33-2; Dkt. No. 30-15, at 53). Out of the five examiners (including Plaintiff) that graduated from polygraph school in March 2016, Plaintiff ranked fourth; only one examiner in that cohort performed worse, with 58 exams completed. (Dkt. No. 33-2). Overall, Plaintiff ranked sixth out of the eleven examiners listed; of the five that performed worse, two retired as some point during that year. (*Id.*).

next week to sit down with PO Orsaio and her chain of command to review her recorded polygraph exam" given that Walker had advised that Plaintiff was not "following the protocol for administering exams as instructed" at polygraph school. (*Id.*). Finally, Adams/Kopp pointed out that Walker had attempted to meet with Plaintiff on two previous occasions at agreed-upon dates and times but learned upon arriving at the Syracuse office that Plaintiff "had left and was not able to be reached." (*Id.*).

### 4. Performance of Nonpolygraph Duties

As part of her responsibilities as an SPO, Hrovat would review and correct CRRs submitted by POs she supervised. (Dkt. No. 30-1, ¶¶ 113, 114). After ensuring that everything was correct, she and the PO would initial the report and hand it over to the area supervisor, who in turn would review the report and make corrections if necessary before submitting it to the agency in Albany. (*Id.* ¶¶ 115, 116; Dkt. No. 30-14, at 29–30). At her deposition, Plaintiff acknowledged that it was "probably" part of Hrovat's and Hess's duties to review her reports and request changes. (Dkt. No. 30-12, at 111). On a couple of occasions, Hrovat requested that Plaintiff make changes to CRRs. (*Id.* at 110–112). Plaintiff testified this had never happened in her 11 years of experience preparing CRRs, and "it was creating a work environment that was totally unnecessary." (*Id.* at 111, 121). But aside from the impact on her work environment and the perceived harassment, Plaintiff conceded that she did not suffer discipline or other negative consequences as a result of Hrovat's or Hess's critiques of her reports. (*Id.* at 120–22). At the end of May 2016,[23] Plaintiff's nonpolygraph duties were reassigned so she could focus on her polygraph goals. (Dkt. No. 30-13, at 221–22; see also Dkt. No. 30-35, at 1; Dkt. No. 30-36).

---

[23] Although Plaintiff notes that Hrovat was still requiring her to complete CRRs in June 2016, (Dkt. No. 33, ¶ 152 (citing Dkt. Nos. 30-37, -38)), the cited emails suggest that the CRRs at issue were reports that were previously, not newly, assigned. The reassignment of her nonpolygraph duties to case-carrying POs concerned newly referred CRRs. (*See* Dkt. No. 30-35, at 1; Dkt. No. 30-36).

Plaintiff testified that it was "impossible" to complete all the LCRs and CRRs in addition to her polygraph duties.[24] (Dkt. No. 30-12, at 174–75). Rigby, the union representative, was aware of her complaints that "she felt that she was unfairly given duties and responsibilities, including [LCRs and CRRs], to do, in addition to her polygrapher duties." (Dkt. No. 30-18, at 25). She mentioned that "she felt that these additional duties made it very difficult for her to learn and to perfect her duties as a polygrapher, because they interfered with her ability to do so." (*Id.*).

### 5.    Time Management

According to Plaintiff's affidavit, Hrovat told Plaintiff that she had "time management issues, which was the first time I ever heard such criticism in my career." (Dkt. No. 33-3, ¶ 1). Although Plaintiff was already "completing a Core Monthly Flight Plan and Bi-weekly Flight Plan"[25] and "Hrovat was in possession of my monthly and weekly polygraph schedules," Hrovat asked her to "fill out a daily calendar." (Dkt. No. 33-3, ¶ 1). Plaintiff asserts that Hrovat "just wanted to make my life harder by loading on me extra work that was not required of any other parole officer." (*Id.*). At her deposition, Hrovat denied "making" Plaintiff fill out a daily calendar; instead, Hrovat "suggested things that kind of worked for me to try to help her so she could get the overtime that she felt she deserved." (Dkt. No. 30-14, at 61). She elaborated:

> [W]hat I was trying to help her do is to map out her week. I didn't tell her she had to have hourly or minutely and she confused that when I explained to her. She was asking for the overtime; that what helped me is printing out those day sheets and draw a line and say

---

[24] To Walker's knowledge, Plaintiff was the only polygrapher among her graduating class who was required to complete all LCRs and CRRs assigned to her regional office, although he added that "every region assigns the examiners different things to do." (Dkt. No. 30-15, at 26–28).

[25] Like any other PO, Plaintiff had to submit a biweekly "flight plan" and a monthly core work schedule, which estimated the days and hours Plaintiff was expected to work over a two-week period and a month, respectively. (Dkt. No. 30-1, ¶¶ 125–127; Dkt. No. 30-13, at 67–68; Dkt. No. 30-14, at 82, 85).

> what I worked on then so to help her justify her overtime so she
> could get it.

(*Id.* at 75).

Plaintiff testified that Hrovat engaged in harassment by requiring her to call in at the beginning and end of the day. (Dkt. No. 30-12, at 159). Other officers only had to call in within two hours of their start and finish. (*Id.*). The reason for this requirement was to ensure that officers were safe. (*Id.*; Dkt. No. 30-14, at 76–77). On June 1, 2016, Plaintiff filed a grievance complaining that Hrovat required her, but not her "peers," to call in at the beginning and end of each day; she further noted that this was "another example of the discriminatory treatment" she described in her May 20, 2016 complaint with the New York State Division of Human Rights ("DHR").[26] (Dkt. No. 30-46; *see* Dkt. No. 30-4). Acting Regional Director Kenneth Gilbert denied the grievance and observed that all POs were required to call in at the beginning and end of the day. (Dkt. No. 30-44, at 1). The agency upheld the decision. (Dkt. No. 30-47, at 2).

On June 16, 2016, Plaintiff filed another grievance in which she complained that Hrovat "in effect chang[ed] my traditional flex schedule to 'standard business hours of 8 am to 6 pm.'" (Dkt. No. 30-48). Hrovat testified that Plaintiff "struggled to get the work done," so Hrovat told her that "she needed to work between those hours in order to get caught up and to get that work done until she could get on track because she wasn't able to maintain the requirements of the job." (Dkt. No. 30-14, at 51–52). According to Plaintiff, Hrovat and Hess said they wanted her in the office during the day "when there was a senior there in case I needed help." (Dkt. No. 30-12, at 132–33, 155). But there were no seniors who could help Plaintiff with her polygraph duties in the Utica Area Office. (*See id.*). Other polygraphers had a flex schedule. (*Id.* at 154–55). In his

---

[26] For a description of the DHR complaint, see Part II.E *infra*.

decision denying the grievance, Gilbert explained that the updated schedule "request was made in an effort to improve productivity and assist with time management." (Dkt. No. 30-44, at 2). The agency upheld the denial. (Dkt. No. 30-47, at 2).

Plaintiff testified about an altercation she had with Hrovat in June 2016. (Dkt. No. 30-12, at 182–85). On a Saturday morning, Plaintiff went to the office to pick up food she had left in her desk. (*Id.* at 184). Hrovat was in the office as well, and when Plaintiff walked by, she asked, "What are you doing here? You're out on sick leave, aren't you?" (*Id.*). Plaintiff answered, "Yes, because of this place, the migraines and what you and Hess are doing. . . . You don't even know me. I don't know why you're supporting whatever he's telling you to do, being his henchman." (*Id.*). Hrovat said, "You're the worst, despicable worker . . . I ever met. Your work is so poor. You're lucky if you have a job next year. But I know I'm going to have a job next year." (*Id.* at 184–85). Plaintiff asked if this was a threat, and Hrovat asked her to leave. (*Id.* at 185).

Plaintiff testified that Hrovat "bothered" her "every day." (*Id.* at 165). She "[c]ame in looking for me. 'What are you doing now? What are you going to do tomorrow? What did you do yesterday? What are you going to do next week? Are you going to get this done?'" (*Id.*). Hrovat's tone was "rude." (*Id.*). When Plaintiff complained that Hrovat was treating her unfairly, Hrovat responded, "Fair is where you go on rides and eat cotton candy." (*Id.*).

### 6.      Request for Overtime

The SPO and the area supervisor must preapprove a PO's overtime, except in unexpected situations beyond a PO's control, such as when a parolee commits a crime at the end of a PO's shift and the PO must report immediately. (Dkt. No. 30-1, ¶¶ 61, 62; Dkt. No. 30-14, at 85–86). The PO must justify the need for overtime. (Dkt. No. 30-1, ¶ 64). According to Plaintiff, polygraphers also face unexpected situations where overtime "should be automatic," such as

when a machine breaks down in the middle of an exam, the interview is running over, or the subject is unwell. (Dkt. No. 30-12, at 124).

On one occasion, at the beginning of May 2016, Plaintiff requested payment for 2.5 hours of overtime. (Dkt. No. 30-1, ¶ 65). The overtime was for a polygraph exam Plaintiff conducted in St. Lawrence, three hours from the Utica Area Office. (Dkt. No. 30-12, at 124–25). Plaintiff recounted:

> I was given a State credit card to stay overnight. It was provided to me through Albany. Stay overnight, go the night before, do the polygraph, because it's three to four hours, and then return home.
>
> When I submitted that overtime I was denied. And I tried to explain that to Hrovat and she didn't understand. She just came back at me with, no overnight. Just do it all the same day. Drive three and a half hours, do the polygraph, all the same day, which is impossible.
>
> So shortly after that, within a week, I was no longer allowed to do any traveling for a polygraph. I was reprimanded [sic] to the Utica and Syracuse office to perform polygraphs.

(*Id.* at 125). Asked if she had sought permission for the overtime, Plaintiff testified, "I believe I did. And I believe it was Senior Pezdek. . . . I just told him that's what my plan was. And he was, like, 'Okay. No problem. Okay.'" (*Id.* at 125–26). She explained that her supervisors had changed by the time she submitted her timesheet to claim the overtime. (*Id.*).[27] According to Hrovat, Plaintiff could not provide the proper justification or documentation about the work that necessitated overtime. (Dkt. No. 30-14, at 91–92). On another occasion in May, Plaintiff had an equipment malfunction in Syracuse; she "raced back to Utica" but "was still two hours over." (Dkt. No. 30-12, at 127). Hrovat denied overtime for that incident. (*Id.*).

---

[27] Plaintiff concedes that this overtime request "did not involve the types of situations described by [her] as exception to the prior approval requirement for overtime compensation." (Dkt. No. 33, ¶ 71).

On May 31, 2016, Plaintiff filed a grievance about the denial of the 2.5 hours of overtime, asserting that this was "another example of the discriminatory treatment" described in her DHR complaint. (Dkt. No. 30-43). Gilbert denied the grievance, observing that "there is no indication that prior supervisor approval was either sought or granted." (Dkt. No. 30-44, at 1). The agency upheld the decision, noting that Plaintiff had submitted her overtime request "without prior approval or notification to her supervisor." (Dkt. No. 30-45, at 2).

### 7. Travel Reimbursement Request

According to Plaintiff's testimony, Blais and Schwarz-Castillo told Plaintiff that DOCCS specifically assigned a state vehicle to the Utica Area Office polygrapher. (Dkt. No. 30-12, at 133–34). But when Plaintiff returned from polygraph school, she "didn't get the car." (*Id.* at 135). Hess assigned it to SPO Pezdek. (*Id.*). Consequently, Plaintiff "had to take a different lot vehicle, which was some broken-down vehicle." (*Id.*). When a lot vehicle was not available, Plaintiff used her own car, but she had to seek approval. (*Id.* at 137). At his deposition, Ricci recalled a conversation with Hess telling him that Plaintiff wanted a state vehicle assigned. (Dkt. No. 30-16, at 78). He "probably didn't approve it unless we had a business reason to approve it." (*Id.* at 78–79).

Plaintiff claims that, after she filed her DHR complaint, Hess denied her mileage reimbursement vouchers for travel to the local jail and the training range but approved every other officer's similar request. (Dkt. No. 30-12, at 189–91). Plaintiff filed a grievance, which Gilbert denied in part. (Dkt. No. 30-50, at 1). As Gilbert pointed out, Hrovat had emailed Plaintiff in May and June 2016 informing her that a state vehicle could be made available for travel. (*Id.*; *see also* Dkt. Nos. 30-34, -41). Yet Plaintiff submitted a September 26, 2016 voucher for "travel to and from Oneida County Jail, training/range, Syracuse, and Watertown" using her personal vehicle; "on each occasion . . . there was a State vehicle available for her to use," and

there was "no indication that she conferred with the Utica Area Office Vehicle Control Officer as to the availability of a State vehicle on those occasions." (Dkt. No. 30-50, at 1). Therefore, Gilbert denied Plaintiff's grievance with respect to that voucher. He then reviewed a travel voucher dated August 8, 2016, which was certified by her previous supervisor and for which she was reimbursed. (*Id.* at 2). Gilbert opined that "[t]his was clearly not in keeping with the direction" to use available state vehicles and that "[t]his oversight by SPO LaPorte does not create a precedent for similar approval of travel vouchers claiming [personal car mileage ('PCM')] incurred when a State vehicle is available." (*Id.*). Nevertheless, he recognized that, regarding "local travel," "other Utica Area Office staff have claimed and were reimbursed for PCM to and from the Oneida County jail and the range for training." (*Id.*). He concluded that Plaintiff was "similarly entitled to and encouraged to submit a travel voucher to be reimbursed for that PCM." (*Id.*).

### 8.     Request for Permission to Seek Outside Employment

Plaintiff asserts that she was "prevented from working part-time outside employment while her male counterparts held part-time employment outside their regular work." (Dkt. No. 30-11, at 14 (naming male officers who received the benefit alleged)). While she concedes that Hess approved her request to work at a sports bar starting in August 2016, (Dkt. No. 30-12, at 14–15; Dkt. No. 33-3, ¶ 13), she claims that she was prevented from working as a security officer at football games and sporting events at the Utica City School District, (Dkt. No. 30-12, at 16–21). In September 2015, Ricci approved Plaintiff's request for permission to seek that outside employment, (Dkt. No. 30-12, at 17; Dkt. No. 30-27), and she was hired for the position, but when she went to pick up her schedule, the people at the school district "had changed their mind," (Dkt. No. 30-12, at 18). A school board member told her that "someone from your

agency called and really put the screws in for you." (Dkt. No. 30-12, at 20–21). According to

Plaintiff, only Pezdek and Hess in her chain of command knew about the job. (*Id.* at 21).

### 9.  Performance Evaluation

A PO's immediate supervisor completes performance evaluations, and the bureau chief

approves them. (Dkt. No. 30-1, ¶ 216). In her July 8, 2016 evaluation of Plaintiff, Hrovat rated

Plaintiff's performance "unsatisfactory." (Dkt. No. 30-52, at 2). For Plaintiff, it was the first

negative evaluation in her career.[28] (Dkt. 30-12, at 27). In the narrative part, the evaluation

stated, among other things, that Plaintiff "struggled to meet the minimum requirements of the

polygraph quota of three exams per week" and "was resistant to accept and complete additional

duties assigned to her." (Dkt. No. 30-52, at 1). It also stated that Plaintiff was "resistant" to

Hrovat's "attempts to supervise her activities and assist with time management in an effort [to]

help improve her work and quotas." (*Id.*). Hrovat testified that she based her evaluation in part

on conversations with Walker, who deemed Plaintiff's polygraph performance to be poor. (Dkt.

No. 30-14, at 105). Per Walker's recollection, he spoke to Hrovat about Plaintiff's performance

after Plaintiff called him complaining about how Hrovat treated her.[29] (Dkt. No. 30-15, at 66).

Upon receiving her negative performance evaluation, Plaintiff asked Walker if he had anything

to do with it; she testified that he was "completely stunned." (Dkt. No. 30-12, at 179).

On September 12, 2016, Hess sent a memo to Plaintiff stating that her performance

evaluation was changed to "satisfactory" because "no evidence has been produced to confirm

that a Part I Section 4 - Six Month Recertification was produced." (Dkt. No. 30-56, at 1). He

added that the "narrative contained within will remain unchanged." (*Id.*). Asked about the change

---

[28] The 2016 evaluation was also Plaintiff's first evaluation as a polygrapher.

[29] At the time she signed the evaluation, Hrovat knew about the discrimination complaint that Plaintiff had filed with the DHR. (Dkt. No. 30-14, at 99).

at his deposition, Hess explained that "Jeff at Human Resources said that we had a fatal flaw in the forms because they weren't initiated—they weren't signed at the beginning stage and the middle stage of the evaluation period." (Dkt. No. 30-13, at 228). Ricci, on the other hand, testified:

> I think our counsel's office got involved and there was a determination that the appearance was that, in fact, it could appear that it was retaliation. They just felt, I guess, it was just easier to just say, go ahead. Give her the satisfactory. It's not worth it, at the end of the day.

> A satisfactory and unsatisfactory eval. in and of itself is not going to have that much of an impact in terms of, you know, she's not going to lose any money. She's not going to be terminated or anything like that.

> So I guess the feeling from counsel's office was just change it back so that we can eliminate any appearance that, in fact, it was retaliation. I guess that was their thinking.

(Dkt. No. 30-16, at 30). Plaintiff admitted that, given the change to "satisfactory," the evaluation had no impact of her ability to receive longevity pay. (Dkt. No. 30-12, at 180). Plaintiff, however, denies that the negative evaluation does not affect her career development. (Dkt. No. 33, ¶ 224). Hess testified that, if he sat on a panel and read the July 2016 evaluation narrative, he would have concerns about the applicant. (Dkt. No. 30-13, at 232). And he acknowledged that having a negative evaluation does not reflect well for POs seeking promotions. (*Id.*). Further, Plaintiff asserts that the negative evaluation caused her to miss an opportunity to transfer to the Syracuse Area Office earlier because her name was "restricted due to the unsatisfactory rating." (Dkt. No. 30-50, at 2).

### 10.  Transfer to Syracuse Office (September 2016)

In May 2016, Plaintiff asked Rigby, an SPO and union representative, to transfer her out of the Utica Area Office because of the alleged discrimination and hostile work environment to

which Hess and Hrovat subjected her. (Dkt. No. 30-12, at 161–62). Rigby "could see [Plaintiff] was emotionally upset, crying and shaking," so he wrote an email to Ricci on May 19, 2016 requesting Plaintiff's transfer to the Syracuse Area Office. (*Id.* at 163; *see* Dkt. No. 30-33, at 2–3).[30] Ricci, however, did not move Plaintiff; he informed Rigby that "it was in the best interest of the Region to have the Polygraph PO to be seated out of the Utica Area Office due to its centralized location." (Dkt. No. 30-33, at 3). Ricci responded that Plaintiff could "utilize the formal [Office of Diversity Management ('ODM')] process to have her complaints reviewed" or "submit a grievance" about discrimination. (*Id.* at 2). But "the Polygraph PO position is assigned to the Utica AO and will remain there in the best interests of CNY Regional operations." (*Id.*).[31] Plaintiff replied, expressing her disappointment. (Dkt. No. 30-33, at 1). Ricci advised her to complete ODM forms. (Dkt. No. 30-33, at 1). Eventually, Plaintiff was able to transfer to the Syracuse Area Office in September 2016. (Dkt. No. 30-12, at 190, 192).

### 11. Counseling Memos

Plaintiff testified that, based on a counseling memo she received in September 2016, she believed Hess continued to retaliate against her after she transferred to the Syracuse Area Office. (Dkt. No. 30-12, at 192–93). The September 27, 2016 counseling memo, from Syracuse Area Office Bureau Chief M.A. Montfort, related to "several incidents of concern regarding matters occurring prior to [Plaintiff's] transfer to the Syracuse Belt and one matter since" and was "issued to memorialize these recent incidents in which [Plaintiff] violated agency policy or supervisory direction." (Dkt. No. 30-58, at 1). The first incident listed in the memo concerned

---

[30] Rigby contacted two bureau chiefs in the Syracuse area, who both agreed to the transfer. (Dkt. No. 30-18, at 17).

[31] Ricci testified that he learned of Plaintiff's sexual orientation when Hess "communicated that one of the complaints of [Plaintiff] was that she was being discriminated against on the basis of her sexual orientation." (Dkt. No. 30-16, at 17–18).

Plaintiff's copying an outside vendor on her September 23, 2016 email to Walker complaining of harassment. (*Id.*; *see supra* Part II.D.3). The second incident involved Plaintiff's letting an unauthorized individual (her girlfriend) access the Utica State Office Building. (Dkt. No. 30-58, at 1; Dkt. No. 30-12, at 194). At her deposition, Plaintiff admitted that the description of these two incidents was accurate. (Dkt. No. 30-12, at 193–94). The third incident listed concerned Plaintiff's use of a personal car instead of available state vehicles in violation of policy and Hrovat's written direction—conduct that the memo characterizes as "an act of insubordination." (Dkt. No. 30-58, at 1–2). The fourth incident referred to Plaintiff's missing scheduled meetings with Walker in August 2016. (*Id.* at 2). Plaintiff rejected the description of these last two incidents. (Dkt. No. 30-12, at 194–97). According to Plaintiff, Hess directed Montfort to issue the memo. (*Id.* at 197–98 ("He made someone else do his dirty work, like he always did.")).

Several months later, on January 11, 2017, Plaintiff received another counseling memo, issued by Walker and SPO Jason Gavras.[32] (Dkt. No. 30-62). The first and third paragraphs detail errors Plaintiff made while performing polygraph exams contrary to the training she received. (*Id.* at 1). Plaintiff testified that the description of errors in those paragraphs is accurate. (Dkt. No. 30-12, at 200, 202). Plaintiff also acknowledged that the fourth paragraph—which countered Plaintiff's claim that she was taught to score in a particular way at polygraph school— was also correct. (*Id.* at 202; *see* Dkt. No. 30-62, at 2). In the memo, Walker noted:

> I have made numerous attempts to help you resolve these issues but instead of acknowledging the mistakes you are making, you indicate that you are "stressed out" and that you would like to return to being a Field Parole Officer and no longer wish to continue implementing polygraph exams.
>
> . . . .

---

[32] Though the memo is from Gavras, he told Plaintiff that he did not want to issue it. (Dkt. No. 30-12, at 200).

On 1/11/2017 you were asked what you felt you needed in order to enhance your capabilities to complete valid exams and you stated you were still "traumatized" by everything that was done to you in Utica. You indicated at this time you are "emotionally unable" to complete polygraph exams at this time but you would do the best you can under the circumstances.

(Dkt. No. 30-62, at 1–2). The memo detailed that Plaintiff was no longer allowed to complete "denial exams" or "render a decision" prior to review by Walker. (*Id.*). Plaintiff testified: "[Walker] wasn't letting me do polygraphs like I should have been. Don't score any. Don't write reports on any. They were just embarrassing me, humiliating me, in front of my fellow parole officers in Syracuse, to the point where they didn't even want to submit referrals for polygraphs anymore." (Dkt. No. 30-12, at 204).

## 12. Request to Be Released from Polygrapher Duties

In a March 30, 2017 email, Walker directed Plaintiff to continue to send copies of her "CD's to [him] for [his] review prior to rendering a decision" and advised that this review process would continue until he was "confident" that Plaintiff could "consistently and accurately score polygraph exams."[33] (Dkt. No. 30-1, ¶ 239; Dkt. No. 30-64). Thompson, the polygraph school director, reviewed one of Plaintiff's exams and indicated that it was unsatisfactory, "not at all meeting the minimum professional standards of the polygraph field and training" and potentially "lead[ing] to legal problems if challenged." (Dkt. No. 30-1, ¶¶ 240–241; Dkt. No. 30-63, at 2). Walker testified that "[b]efore she left the unit [Plaintiff] was performing much better but it had gotten really bad." (Dkt. No. 30-15, at 92). At that time, Hess and Hrovat were no longer supervising Plaintiff's work. (*Id.*).

---

[33] Walker testified that it "takes five years to become a good examiner . . . everyone learns at different speeds." (Dkt. No. 30-15, at 42). He added: "Because you get to see every different type of exam, every different type of parolee, every different type of interview. It's a work in progress and I'm still learning." (*Id.*).

Plaintiff wrote letters to Gilbert, Adams/Kopp, and Walker asking to be removed from her polygraph special assignment position. (Dkt. No. 30-12, at 211–13). Per a June 8, 2017 memo, Gilbert granted Plaintiff's request to be released from her polygraph position. (Dkt. No. 30-68). Plaintiff returned to a nonspecialized caseload in the Syracuse Area Office. (*Id.*).

### 13. Return to Utica Office (November 2017)

Hess retired at the end of September 2017. (Dkt. No. 30-13, at 18). The day he retired, Plaintiff requested to transfer back to the Utica Area Office. (Dkt. No. 30-12, at 207). Upon her return in November 2017, Plaintiff was placed alone in an office isolated from all other parole officers. (*Id.* at 9, 224–25). There are usually four officers to an office. (*Id.* at 224). Plaintiff continues to work in the Utica Area Office. (Dkt. No. 33-3, ¶ 18).

### E. Procedural History

On May 20, 2016, the DHR received a complaint from Plaintiff alleging that DOCCS engaged in "an unlawful discriminatory practice relating to employment . . . because of sex, sexual orientation." (Dkt. No. 30-4, at 1; *see also id.* at 3 (checking off the "Sexual Orientation" box and writing in "Gay Female")). She listed two individuals who discriminated against her: Hess and Hrovat. (*Id.* at 2). On the complaint form, she checked off two acts of discrimination: "Harassed or intimidated me (other than sexual harassment)"; and "Gave me different or worse job duties than other workers in my same title." (*Id.* at 4). Further, she attached three pages of typewritten and handwritten notes detailing her allegations. (*Id.* at 5–7).

The DHR issued a determination and order after investigation on November 10, 2016, dismissing the complaint and finding no probable cause to believe that DOCCS engaged in the unlawful discriminatory practice alleged. (Dkt. No. 30-5, at 1–2). On December 16, 2016, the U.S. Equal Employment Opportunity Commission ("EEOC") issued a dismissal and notice of rights (also known as a right-to-sue letter) adopting the findings of the DHR. (*Id.* at 3). The right-

to-sue letter, which indicated that any lawsuit had to be filed within 90 days of receipt of the

letter, was addressed to Plaintiff at 121 Higby Road, Utica, New York, (*id.*), where Plaintiff has

resided since October 2016, (Dkt. No. 30-12, at 5). DOCCS's ODM received its copy of the

right-to-sue letter on December 20, 2016. (Dkt. No. 30-5, at 3). In an affidavit dated July 24,

2017, Plaintiff stated:

> I am confident that I never received the EEOC Right-to-Sue Letter
> related to my May 20, 2016 complaint in December 2016. I also did
> not receive a Right-to-Sue letter from the Attorney General. I know
> that because I was advised not to request a Right-to-Sue letter from
> the EEOC until a determination was made on my second complaint
> against the defendants for retaliating against me after I filed the May
> 20, 2016 complaint of discrimination.
>
> . . . .
>
> . . . The first time I saw the Right-to-Sue letter for both complaints I
> filed with the EEOC was after my attorney received these envelopes
> mailed on June 1, 2017.

(Dkt. No. 9-1, ¶¶ 4, 8).

The second complaint referred to in the affidavit was a charge Plaintiff filed with the

EEOC on August 5, 2016, alleging that DOCCS retaliated against her for filing the May 20,

2016 DHR complaint. (Dkt. No. 30-6). Plaintiff listed Hess and Hrovat as individuals who

discriminated against Plaintiff. (*Id.* at 3). She checked off the "Retaliation" box. (*Id.* at 4). In

selecting the act of discrimination alleged, she circled the last three words of "Gave me a

disciplinary notice or negative performance evaluation." (*Id.* at 5). Her description of the

discriminatory act consisted of one page of handwritten notes detailing the fact that she "received

first negative performance evaluation after 16 yrs with agency" after she filed her May 20, 2016

DHR complaint. (*Id.* at 6).

On January 26, 2017, the DHR issued a determination after investigation finding that

there was probable cause to believe that Defendant engaged in the unlawful discriminatory

practice alleged and referring the matter to a public hearing. (Dkt. No. 30-7, at 1, 7–9). Before a hearing was held, Plaintiff requested—and the assigned DHR administrative law judge granted—an administrative convenience dismissal in order to commence a federal action. (Dkt. No. 30-8).

Plaintiff filed an internal complaint with ODM the same day that DHR issued its January 26, 2017 determination. (Dkt. No. 30-9). She claimed retaliation and discrimination based on sexual orientation against Hess and alleged that the discrimination started in June or July 2015. (*Id.* at 2). Because the allegations "appear to have been included and addressed in the complaints" filed with the DHR, ODM declined to investigate further. (Dkt. No. 30-10).

On June 23, 2017, Plaintiff filed this federal action, alleging hostile work environment, discrimination on the basis of sex, and retaliation against Defendants under Title VII of the Civil Rights Act of 1964, as well as hostile work environment, discrimination on the basis of sex and sexual orientation, and retaliation under the NYHRL. (Dkt. No. 1).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

Individuals are not subject to liability under Title VII. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). Further, sovereign immunity shields state agencies and officers named in their official capacity from being sued in federal court on NYHRL claims without their consent. *See Popat v. Levy*, 328 F. Supp. 3d 106, 134 (W.D.N.Y. 2018) (collecting cases holding

that the NYHRL does not waive New York's sovereign immunity from suit in federal court); *see also Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 429, 430 (S.D.N.Y. 2017) ("[U]nder the doctrine of sovereign immunity, an individual may not sue a state, its agencies, or its officials in federal court, absent that state's consent or an express statutory waiver of immunity."). Here, Plaintiff sues the individual Defendants in their official capacities only. (Dkt. No. 1, ¶¶ 7–9). Plaintiff concedes these points. (Dkt. No. 33-6, at 37). Accordingly, the Title VII claims against the individual Defendants, as well as the NYHRL claims against all Defendants, are dismissed. The Court now turns to the remaining Title VII claims.

### A.     90-Day Time Limit

To be timely, a claim under Title VII must be brought within 90 days of the claimant's receipt of an EEOC right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996). "There is a presumption that a notice provided by a government agency was mailed on the date shown on the notice." *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011). Further, there is a presumption that "a mailed document is received three days after its mailing." *Id.* Nevertheless, these "initial" presumptions are "not dispositive," *id.*, as long as "a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail," *Sherlock*, 84 F.3d at 526.

Relying on the mailing and receipt presumptions, Defendants argue that Plaintiff's sex discrimination and hostile work environment claims are untimely because the EEOC right-to-sue letter regarding those claims is dated December 16, 2016, but Plaintiff commenced this action on June 23, 2017, "well beyond the 90-day time limit." (Dkt. No. 30-2, at 8–9). Defendants also note that the EEOC notification was correctly addressed to Plaintiff's 121 Higby Road address,

where Plaintiff has lived since October 2016. (*Id.*). Plaintiff, however, has submitted an affidavit asserting that she is "confident" that she never received the right-to-sue letter in December 2016 and stating that she saw it for the first time after her attorney received correspondence from DHR mailed on June 1, 2017. (Dkt. No. 9-1, ¶¶ 4, 8). Citing *Gardner v. Honest Weight Food Co-op., Inc.*, 96 F. Supp. 2d 154, 159 (N.D.N.Y. 2000), Plaintiff asserts that her affidavit is sufficient to rebut the mailing and receipt presumptions and create a triable issue of fact for a jury to decide. (Dkt. No. 33-6, at 9). In *Gardner*, however, the plaintiff presented physical evidence (a mailing envelope with a metered stamp date) showing that the EEOC letter was mailed one day after it was issued. 96 F. Supp. 2d at 159. Because of the intervening July 4 weekend, both the plaintiff and her counsel received the EEOC letter a few days later, a fact that both attested to in their respective affidavits. *Id.* In these circumstances, it could reasonably be inferred that the letter was mailed later than its typewritten date and that it took longer than three days to reach the plaintiff. *Id.*

By contrast, here, Plaintiff solely relies on her assertion of nonreceipt and does not describe any circumstances from which the Court could reasonably infer nonreceipt (or delayed receipt), such as a change of residence or other mail delivery issues. *See Hogarth v. N.Y.C. Health & Hosps. Corp.*, No. 97-cv-0625, 2000 WL 375242, at *4, 2000 U.S. Dist. LEXIS 4590, at *12 (S.D.N.Y. Apr. 12, 2000) ("A successful rebuttal requires 'proof of specific facts.'" (quoting *Legille v. Dann*, 544 F.2d 1, 4 (D.C. Cir.1976))). Further, the three-day mailing and receipt presumptions accurately predict that ODM received its copy of the letter on December 20, 2016—which is three days from December 16, 2016 once allowance is made for no mail service on Sunday, December 18, 2016. Therefore, Plaintiff has not successfully rebutted the mailing and receipt presumptions, and her discrimination claims are time barred. In any event,

even if the discrimination claims were timely, they would have to be dismissed for the additional reasons set forth in Parts IV.C and IV.D *infra*.

### B.  300-Day Statute of Limitations

Title VII provides that an EEOC "charge must be filed within 180 or 300 days 'after the alleged unlawful employment practice occurred.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). In a state like New York "that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice." *Id.* at 109; *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015).

In *Morgan*, the Supreme Court explained the "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. at 113. "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* Though time barred, discrete prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Id.* By contrast, a hostile work environment involves "repeated conduct" that is "different in kind from discrete acts." *Id.* at 115. It is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Even if "some of the component acts of the hostile work environment fall outside the statutory time period," the claim is timely as long as "an act contributing to the claim occurs within the filing period"; then, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*; *accord Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) ("When . . . a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct.").

Based on this case law, Defendants correctly argue that, because Plaintiff filed her first DHR complaint on May 20, 2016, any alleged discrete discriminatory act occurring before July 25, 2015 (the earliest date in the 300-day look-back period) is time barred. (Dkt. No. 30-2, at 9–10). Among the allegations falling in that category, Defendants identify Plaintiff's complaints about Hess raising her SIST caseload numbers "towards the end of 2014, beginning of 2015," (*id.* (quoting Dkt. No. 30-12, at 48)), his denial of her request to be removed from the SIST caseload "around the beginning of 2015," (*id.* (quoting Dkt. No. 30-12, at 52)), and his "blocking" her transfer to the Herkimer County caseload in January 2015, (*id.* (quoting Dkt. No. 30-12, at 62, 65)). In her opposition, Plaintiff fails to tailor her arguments to the issue of discrete discriminatory acts and instead maintains that the Court should consider all her allegations in assessing the hostile work environment claim. (Dkt. No. 33-6, at 10–11). She also asserts, without citing evidence in the record, that DOCCS had a "longstanding and continuous policy" of "condoning and tolerating sexual harassment of homosexual employees." (*Id.* at 11).

A hostile work environment claim is not "a vehicle for resurrecting time-barred claims of discrimination." *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 367 (N.D.N.Y. 2017) (quoting *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 648 (W.D.N.Y. 2014)). It is "a wholly separate cause of action designed to address other types of work place behavior, like constant jokes and ridicule or physical intimidation," and a plaintiff "cannot piggyback the discrete adverse acts about which [she] complains onto hostile work environment in order to make them actionable." *Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 591 (S.D.N.Y. 2012) (internal quotation marks omitted). "[E]mployment practices such as failure to promote, failure to compensate adequately, undesirable work transfers, and denial of preferred job assignments are considered discrete acts." *Benjamin v. Brookhaven Sci. Assocs., LLC*, 387 F. Supp. 2d 146,

153 (E.D.N.Y. 2005); *see also Birch v. City of New York*, 675 F. App'x 43, 44 (2d Cir. 2017) (characterizing as discrete acts allegations of "punitive transfers, undesirable assignments, and poor performance review"). Similarly, increasing an employee's workload is a discrete act. *See Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 14-cv-5125, 2018 WL 1603872, at *4, 2018 U.S. Dist. LEXIS 56759, at *11 (E.D.N.Y. Mar. 30, 2018), *aff'd*, 767 F. App'x 123 (2d Cir. 2019). Therefore, the Court agrees with Defendants that the alleged discrete discriminatory acts relating to Plaintiff's increased SIST workload, the denial of her request to be removed from the SIST caseload, and the denial of her transfer to the Herkimer County caseload are time barred.

### C.     Sex Discrimination

Discrimination claims under Title VII are generally evaluated under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that

the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)). Defendants do not dispute that Plaintiff satisfies the first and second prongs of a prima facie case, as they concede that Plaintiff is a member of a protected class (as a female) and is qualified for the position of PO. (Dkt. No. 30-2, at 12). However, Defendants maintain that Plaintiff cannot satisfy the third prong because she "cannot show that she experienced any adverse employment actions during the relevant time period." (Dkt. No. 30-2, at 13). And they argue that Plaintiff cannot meet the fourth prong because she "cannot show that any of the acts complained of occurred under circumstances giving rise to an inference of discrimination." (*Id.*).

An adverse employment action is "a materially adverse change in the terms and conditions of employment." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "To be materially adverse a change in working conditions must be more disruptive than a mere

inconvenience or an alteration of job responsibilities." *Id.* "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.*; *accord Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (stating that an adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). As for the fourth prong, a plaintiff can "meet that burden through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (citation omitted).

Here, Plaintiff identifies five discrete discriminatory acts to which she was subjected: (1) disproportionate increase in her SIST caseload; (2) disproportionate assignment of LCRs and CRRs; (3) denial of overtime for polygraph duties in 2016; (4) change to her work schedule and denial of a flex schedule; and (5) assignment of the state vehicle designated for polygrapher to another officer.[34] (Dkt. No. 33-6, at 36). As discussed above, the first act listed is time barred because it occurred at the end of 2014 or beginning of 2015, i.e., more than 300 days before she complained. (*See supra* Part IV.B). The Court analyzes the remaining four acts below.

---

[34] Plaintiff does not address Defendants' arguments that she did not suffer adverse employment actions with respect to allegations that Hess did not switch her duty day, that Hess and Hrovat exercised excessive monitoring and scrutiny, and that Plaintiff was excluded from outside employment. (*See* Dkt. No. 36, at 18). Further, Plaintiff does not respond to Defendants' arguments that the delay in her transfer to the Otsego County caseload and the denial of a four-hour overtime opportunity in August 2015 constitute adverse employment actions. (*See* Dkt. No. 14–16). Therefore, to the extent Plaintiff's sex discrimination claims are based on these allegations, they are deemed abandoned. *See Iron Workers Local No. 60 Annuity Pension Fund ex rel. Robb v. Solvay Iron Works, Inc.*, No. 15-cv-54, 2018 WL 2185510, at *15, 2018 U.S. Dist. LEXIS 79735, at *41 (N.D.N.Y. May 11, 2018). The Court will only consider the five events listed in Plaintiff's opposition brief.

## 1.      Assignment of LCRs and CRRs

It is undisputed that, when Plaintiff interviewed for the polygrapher position—a position for which Hess recommended her—she was told that all polygraph candidates would be required to fulfill nonpolygraph duties in addition to their polygraph work. (Dkt. No. 30-1, ¶ 142; Dkt. No. 33, ¶ 142). Plaintiff was assigned all CRRs and LCRs upon her return from polygraph school—specifically, Hess assigned her four CRRs over the course of three months and five LCRs, all of which involved inmates that declined local conditional release. (Dkt. No. 30-13, at 194, 197–98; Dkt. Nos. 30-35, -36). Plaintiff has not presented evidence that the assignment of CRRs and LCRs led to a reduction in pay or benefits or that it materially altered the terms and conditions of her employment. *See Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-cv-234, 2013 WL 5230037, at *3, 2013 U.S. Dist. LEXIS 131860, at *11–12 (E.D.N.Y. Sept. 16, 2013) (observing that "assignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where, as here, the rate of pay and benefits remains the same"). In these circumstances, the assignment of CRRs and LCRs cannot be deemed an adverse employment action.

Even assuming that such an assignment is an adverse employment action, Plaintiff has not presented any evidence that would permit an inference that the assignment was an instance of sex discrimination. Although Plaintiff was the only polygrapher assigned LCRs and CRRs, there is no dispute that polygraphers in other offices also had to perform nonpolygraph duties. (Dkt. No. 30-1, ¶ 151). Plaintiff asserts that CRRs and LCRs had previously been rotated within the regional office. (Dkt. No. 30-12, at 105, 115). But Hess testified that the decision to assign them to the polygrapher was made based on "how much time the polygraph person would have" and because "they were traveling to these counties." (Dkt. No. 30-13, at 199–200). While Plaintiff disputes that operational needs were the reason for the change, she does not proffer evidence that

casts doubt on that rationale. Instead, she cites her general testimony that Hess did not like her, made derogatory statements about her,[35] mimicked the way she walked, and applied policies inconsistently to her detriment. (Dkt. No. 33, ¶ 146 (quoting Dkt. No. 30-12, at 30, 36–38, 41, 44–45, 118–119)). Even if this testimony were sufficient to infer that Hess bore antigay animosity toward her, it would be speculative to conclude, absent any supporting evidence, that Hess's decision to assign LCRs and CRRs to Plaintiff was tainted by discrimination.

### 2. Denial of Overtime in 2016

In May 2016, Plaintiff requested overtime for a polygraph exam Plaintiff conducted in St. Lawrence, three hours from the Utica Area Office, and for an equipment malfunction in Syracuse that delayed her by two hours. (Dkt. No. 30-12, at 124–25, 127). Hrovat denied the requests. (*Id.*). Hrovat testified that Plaintiff could not provide the proper justification or documentation about the work that necessitated overtime. (Dkt. No. 30-14, at 91–92). There is no dispute that a PO must justify the need for overtime. (Dkt. No. 30-1, ¶ 64).

Without any citation to supporting authorities, Defendants contend that denial of a few hours of overtime does not qualify as an adverse employment action. (Dkt. No. 30-2, at 18). It is well established, however, that denial of requested overtime may constitute an adverse employment action. *See Castillo v. Time Warner Cable of N.Y.C.*, No. 09-cv-7644, 2011 WL 3475419, at *5, 2011 U.S. Dist. LEXIS 88137, at *13 (S.D.N.Y. Aug. 9, 2011). Defendants are on firmer ground in arguing that Plaintiff has not proffered evidence that the circumstances surrounding the overtime denial gives rise to an inference of discrimination. (Dkt. No. 30-2, at

---

[35] According to Plaintiff, Hess called her a "douchebag." (Dkt. No. 30-12, at 38). As the Second Circuit has observed, however, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Naumovski v. Norris*, No. 18-1556-cv, 2019 WL 3770193, at *8, 2019 U.S. App. LEXIS 23891, at *18 (2d Cir. Aug. 12, 2019) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).

18). The only evidence Plaintiff mustered to support her claim that Hrovat discriminated against her is that Hrovat, when discussing time management issues with Plaintiff, mentioned an interview with a transgender parolee that took hours to conduct. (*See* Dkt. No. 30-12, at 128–29, 211; Dkt. No. 30-14, at 71). No reasonable jury could find, based on Plaintiff's testimony, that Hrovat harbored antigay animus toward her. Even assuming that a jury could attribute such views to Hrovat, there is no evidence in the record from which the Court could reasonably infer that the decision to deny Plaintiff overtime stemmed from discriminatory animus toward gay females. Nor has Plaintiff shown that similarly situated employees outside her protected class were treated differently with regard to the overtime justification requirement.

### 3. Work Schedule

Plaintiff asserts that Hrovat changed her work schedule and denied her a flexible work schedule, whereas other POs in the office and other polygraphers enjoyed flexibility. (*See* Dkt. No. 30-12, at 132–33, 154–55). Hrovat asked Plaintiff to work standard business hours. (*See* Dkt. No. 30-48). But minor changes to an employee's work schedule and unfavorable hours do not amount to an adverse employment action. *See Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 619 (S.D.N.Y. 2009) (collecting cases). They are a "mere inconvenience." *Constance v. Pepsi Bottling Co.*, No. 03-cv-5009, 2007 WL 2460688, at *18, 2007 U.S. Dist. LEXIS 99558, at *45–46 (E.D.N.Y. June 18, 2007), *report-recommendation adopted*, 2007 WL 2460688, 2007 U.S. Dist. LEXIS 62599 (E.D.N.Y. Aug. 24, 2007). Indeed, Plaintiff has not adduced any evidence that the schedule change resulted in a reduction in pay or responsibilities amounting to a material change in the terms and conditions of her employment. Further, even if the schedule change were an adverse employment action, there is no evidence from which a reasonable jury could infer a discriminatory basis for the decision. Defendants, on the other hand, have articulated a nondiscriminatory reason for the change: according to Hrovat, Plaintiff was having

difficulty performing her polygraph duties. (Dkt. No. 30-14, at 51–52). Plaintiff has not presented any evidence to rebut that rationale.

### 4.      Assignment of State Vehicle

According to her testimony, Plaintiff was told that DOCCS had specifically assigned a state vehicle to the Utica Area Office polygrapher; when she returned from polygraph school, however, the car was assigned to SPO Pezdek instead. (Dkt. No. 30-12, at 133–34). Consequently, Plaintiff "had to take a different lot vehicle, which was some broken-down vehicle." (*Id.*). On May 24, 2016, Hrovat emailed Plaintiff that a state vehicle could be made available for polygraph-related travel depending on her work schedule and best use of state resources. (Dkt. No. 30-34, at 1). A few weeks later, on June 14, 2016, Hrovat wrote Plaintiff that "an additional state vehicle" was available at the Utica Area Office and that Plaintiff should coordinate all future travel with Pezdek, the "vehicle control officer," to ensure appropriate use of state resources. (Dkt. No. 30-41). The Court is aware of no authority holding that the required use of a lot vehicle instead of a take-home vehicle for official business constitutes an adverse employment action. Furthermore, Plaintiff has not submitted any evidence suggesting that Hrovat's instructions about the use of a state vehicle manifested discriminatory animus toward or disparate treatment of Plaintiff as a gay female.

As discussed above, there are no genuine issues of material fact concerning Plaintiff's failure to establish a prima facie case—let alone rebut Defendants' proffered nondiscriminatory reasons—in connection with the four alleged acts of sex-based discrimination. Therefore, the Court dismisses Plaintiff's sex discrimination claim.

### D. Hostile Work Environment

#### 1. Legal Standard

To establish a hostile work environment claim under Title VII, Plaintiff must demonstrate harassment based on her sex. 42 U.S.C. § 2000e-2(a). The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Thus, the factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile work environment claim, a plaintiff must first show "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment" *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks omitted); *accord Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to establish a hostile work environment" (internal quotation marks omitted)). Further, "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee*, 223 F.3d at 69 (internal quotation marks omitted).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). But if no reasonable jury could conclude, considering all the circumstances, that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*," *Schiano*, 445 F.3d at 600 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)), a court may conclude as a matter of law that the work environment is not sufficiently hostile to violate Title VII.

### 2. Application

In her opposition brief, Plaintiff lists 24 facts that, "when combined," show a hostile work environment. (Dkt. No. 33-6, at 29–32). Some of these facts are not actions by Defendants but descriptions of Plaintiff's actions and emotional state or assertions about other individuals' state of mind. (*See, e.g.*, *id.* at 30 (asserting that "other parole officers knew that Defendant Hess was keeping Plaintiff isolated" and that Plaintiff was "very emotional and sat at her desk crying half of the time")). Some others are alleged discrete discriminatory acts, (*see, e.g.*, *id.* (stating

that "Plaintiff lost a job opportunity" at a school district)), falling outside the scope of conduct actionable under a hostile work environment claim, *see Lioi*, 914 F. Supp. 2d at 591 (explaining that a hostile work environment claim addresses workplace behavior such as "constant jokes and ridicule or physical intimation," not discrete adverse acts). The remaining allegations germane to the hostile work environment claim are as follows: (1) "Hess stopped talking and began to ostracize her" after he purportedly learned her sexual orientation around September 2014; (2) "Hess would give her 'filthy looks,' call her a 'douche bag,' and mimic the way she walked"; (3) when Plaintiff told Hrovat that her treatment was not fair, Hrovat responded, "Fair is where you go on rides and eat cotton candy"; (4) in June 2016, Hrovat told Plaintiff that she was "the worst, despicable worker" Hrovat had ever met and that her work was "so poor" that she would be "lucky if you have a job next year"; (5) in October 2015, Plaintiff discovered on the office's bulletin board a photograph of her defaced "with a goatee and mustache drawn on her face"; (6) in late 2014, when Plaintiff asked PO Schwarz-Castillo why Hess did not like her, he said, "Because you don't like cock"; (7) on one occasion, a PO asked her "why she was not wearing a tie"; and (8) Hrovat used a "transgender anecdote" to "lecture Plaintiff on time management" around May 2016.[36] (Dkt. No. 33-6, at 30–32).

Even if viewed in the light most favorable to Plaintiff, none of the above-listed conduct, whether taken in isolation or in the aggregate, rises to the level of actionable harassment based on sex or sexual orientation amounting to a hostile work environment. As an initial matter, there is no direct or circumstantial evidence tying some of the comments or acts described—such as Hrovat's comment about fairness or her statement that Plaintiff was a "despicable worker"—to

---

[36] Unless otherwise noted, the record does not specify when the alleged comments or acts occurred.

Plaintiff's gender or sexual orientation.[37] As for the allegation that Hess ignored Plaintiff, that behavior is not sufficient severe or pervasive to be actionable. *See Campbell v. Nat'l Fuel Gas Distribution Corp.*, No. 13-cv-00438, 2016 WL 8929078, at *9–10, 2016 U.S. Dist. LEXIS 98344, at *30–31 (W.D.N.Y. July 26, 2016) (ruling that the plaintiff's complaint of being "ignored" every day and given the "cold shoulder treatment" is not sufficiently severe or pervasive to establish a hostile work environment claim). Likewise, while the alleged comments and taunts directed to Plaintiff over two years range from the sarcastic to the outright vulgar, they amount to "merely offensive, unprofessional, or childish [conduct that] cannot support a hostile work environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks omitted); *see Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (affirming dismissal of hostile work environment claim premised on "rude and hostile" behavior by supervisor on "various occasions"); *Zucco v. Auto Zone, Inc*., 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to establish a hostile work environment" (internal quotation marks omitted)); *Hawkins v. City of New York*, No. 99-cv-11704, 2005 WL 1861855, at *15–16, 2005 U.S. Dist. LEXIS 15898, at *43 (S.D.N.Y. Aug. 4, 2005) (concluding that the alleged "unkind" comments were "so isolated that they do not meet the threshold for a hostile work environment claim").

Accordingly, the Court finds that Plaintiff has failed to raise a genuine issue of fact about the existence of an objectively hostile work environment. That claim is dismissed.

---

[37] Although Defendants argue that neither Hess nor Hrovat knew about Plaintiff's sexual orientation, the record contains sufficient evidence to raise a genuine issue of material fact on this issue. (*See* Dkt. No. 30-12, at 28–31, 35–36; Dkt. No. 33-5, ¶¶ 3, 4). Summary judgment, therefore, cannot be premised on lack of knowledge. *See Stafford v. N.Y. Presbyterian Hosp.*, No. 06-cv-2150, 2011 WL 1131104, at *12 n.6, 2011 U.S. Dist. LEXIS 32302, at *37–39 n.6 (E.D.N.Y. Mar. 28, 2011) (denying summary judgment given factual issues whether defendants knew about plaintiff's sexual orientation, which was allegedly "common knowledge" at the office).

### E.    Retaliation

#### 1.    Legal Standard

Retaliation claims under Title VII must be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). A plaintiff must first establish the four elements of a prima facie case of retaliation: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

The definition of "adverse employment action" in the retaliation context is "not limited to discrimination actions that affect the terms and conditions of employment," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), but rather covers harms that might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012). The requirement that the employer's action be materially adverse is meant to separate significant from trivial harms. *White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). The perspective is that of a reasonable employee because the harm must be assessed objectively. *Id.*

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa*, 708 F.3d at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Nassar*, 570 U.S. at 362. To satisfy that burden, "the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is pretext for retaliation." *Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 525 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139 (2d Cir. 2019). "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Pretext may be shown, among other things, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Kwan*, 737 F.3d at 846.

### 2. Application

Defendants concede that Plaintiff's filing a DHR complaint on May 20, 2016 qualifies as a protected activity. (Dkt. No. 30-2, at 41). However, they argue that Plaintiff has failed to make

out the third element (adverse employment action) and fourth element (but-for causation) of a prima facie case of retaliation, and further that there were legitimate, nonretaliatory reasons for their actions. (*Id.* at 41–46).

### a. 2016 Performance Evaluation

Defendants contend that the "unsatisfactory" performance evaluation Hrovat gave Plaintiff on July 8, 2016 is not an adverse employment action because Plaintiff did not suffer an accompanying "demotion, diminution of wages, or other tangible loss," (*id.*), but the quoted language comes from a court's discussion of Title VII discrimination, not retaliation.[38] Defendants also cite *Farina v. Branford Board of Education*, 458 F. App'x 13, 17 (2d Cir. 2011), which discussed a retaliation claim under the ADA. In any event, the Second Circuit has made it clear that "a poor evaluation could very well deter a reasonable worker from complaining," *Vega*, 801 F.3d at 92, and may therefore constitute an adverse employment action for purposes of a Title VII retaliation claim. Defendants argue that the performance evaluation cannot be deemed an adverse employment action because the rating was changed to "satisfactory." (Dkt. No. 30-2, at 41–42). Despite the rating change, Hess stated that the "narrative contained within will remain unchanged." (Dkt. No. 30-56, at 1). Because a jury could find that the negative narrative would have deterred a reasonable worker from complaining, whether the 2016 performance evaluation qualifies as an adverse employment action is a question that must await trial. Additionally, the temporal proximity between the May 20, 2016 DHR complaint and the July 8, 2016 evaluation is sufficient to show a causal connection at the summary judgment stage.

---

[38] *See Petyan v. N.Y.C. Law Dep't*, No. 14-cv-1434, 2015 WL 1855961, at *9, 2015 U.S. Dist. LEXIS 53380, at *27–28 (S.D.N.Y. Apr. 23, 2015), *report-recommendation adopted*, 2015 WL 4104841, 2015 U.S. Dist. LEXIS 88188 (S.D.N.Y. July 2, 2015).

Defendants advance legitimate, nonretaliatory reasons for the negative evaluation, citing evidence that Plaintiff performed poorly as a polygraph examiner. (Dkt. No. 30-2, at 42–44). Plaintiff identifies two facts that arguably goes to pretext. First, the 2016 performance evaluation came down a few weeks after Plaintiff filed her DHR complaint. Second, the change in the evaluation rating and the differing rationales for the change could raise doubts about Defendants' actual motive. Hess testified that the change was made because a human resources employee noted a procedural irregularity in the evaluation forms, which "weren't signed at the beginning stage and the middle stage of the evaluation period." (Dkt. No. 30-13, at 228). Ricci, on the other hand, testified that DOCCS's "counsel's office got involved and there was a determination that the appearance was that, in fact, it could appear that it was retaliation." (Dkt. No. 30-16, at 30). According to him, the change was made to "eliminate any appearance that, in fact, it was retaliation." (*Id.*).

Whether Plaintiff has made a sufficient showing of pretext is a close question, considering her documented poor performance as a polygrapher. Nevertheless, viewing all evidence in the light most favorable to Plaintiff, the Court concludes that she has adduced enough evidence of pretext—although just barely—to survive summary judgment.

### b. Other Alleged Retaliatory Acts

In addition to the negative evaluation, Plaintiff claims that she suffered additional retaliatory acts, including the denial of her request for mileage reimbursement and the issuance of counseling memos. (Dkt. No. 30-12, at 189; 192). Defendants argue that the denial of mileage reimbursement for local travel and the issuance of counseling memos are not adverse actions, and further that there were legitimate, nonretaliatory reasons for these actions. (Dkt. No. 30-2, at 44–46). They observe that Plaintiff failed to coordinate with the vehicle control officer regarding the availability of a state vehicle before using her personal car, that Plaintiff violated agency

52

policies and supervisory directions, and that Plaintiff continued to make "serious errors" in her polygraph examinations. (Dkt. No. 30-2, at 44–46).

Assuming arguendo that denial of mileage reimbursement is an adverse employment action, Plaintiff has failed to adduce any evidence that the reason for the denial was pretextual. On May 24, 2016, she received an email from Hrovat indicating that a state vehicle could be made available for travel based on Plaintiff's "travel schedule/and best use of state resources." (Dkt. No. 30-34). On June 14, 2016, Hrovat emailed Plaintiff with the following instruction: "On all future travel please coordinate w/SPO Pezdek, our vehicle control officer to utilize this state vehicle to again ensure appropriate use of state resources." (Dkt. No. 30-41). Nothing in the record indicates that the denial of personal mileage reimbursement was for any reason other than Plaintiff's failure to follow these procedures. As for personal mileage reimbursement for travel to the local jail and shooting range, Plaintiff was ultimately reimbursed upon the grievance officer's recognition that enforcement was spotty. (Dkt. No. 30-50, at 1–2). Notably, the lax enforcement of reimbursement procedures advantaged Plaintiff on at least one occasion, so there can be no inference that Defendants selectively enforced the procedures against Plaintiff. (*See id.*).

As to counseling memos, the Second Circuit has explained that "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir.2001), *abrogated on other grounds by Morgan*, 536 U.S. 101 (2002)). Plaintiff has not submitted any evidence indicating that the September 2016 and January 2017 counseling memos were of a disciplinary nature. Rather, the September 2016 counseling memo placed Plaintiff "on notice" regarding "incidents of concern" and advised Plaintiff to adhere to agency

policies and supervisory directions. (Dkt. No. 30-58, at 1–2). The January 2017 counseling memo followed a "counseling session" where Plaintiff and Walker, her technical advisor, "discussed quality control" of Plaintiff's polygraph examinations, as well as her competency. (Dkt. No. 30-62, at 1). Because of Plaintiff's continuing errors, Walker required prior review of her examinations. (*Id.*). Based on these facts, no reasonable jury would deem the memos to be adverse employment actions. Further, Plaintiff has not proffered any evidence causally linking her May 2016 DHR complaint to the counseling memos beyond the three months separating the complaint from the September 2016 memo. Even if it were enough for establishing a prima facie case, it is not sufficient on its own to establish pretext; indeed, Plaintiff has not identified any evidence from which pretext could be inferred.

For the all above reasons, the Court concludes that Plaintiff cannot base her retaliation claims on the reimbursement denial or the counseling memos. The claim, however, may proceed to trial with respect to the 2016 performance evaluation.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Complaint's NYHRL claims (the fourth, fifth, and sixth causes of actions) are **DISMISSED**; and it is further

**ORDERED** that the Complaint's Title VII sex discrimination and hostile work environment claims (the first and second causes of action) are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Complaint's Title VII claims against the individual defendants Annucci, Hess, and Hrovat are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to terminate Annucci, Hess, and Hrovat as defendants; and it is further

**ORDERED** that, in accordance with this Decision and Order, the Complaint's Title VII retaliation claim may proceed to trial against DOCCS only insofar as it is based on the 2016 performance evaluation.

**IT IS SO ORDERED.**

Dated: August 19, 2019
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge